2003 OK CIV APP 49

**In the Matter of T.L. and L.N., Deprived Children.**

**State of Oklahoma, Plaintiff/Appellee,**

v.

**D.N., Natural Mother, Defendant/Appellant.**

**No. 97,308.**

Court of Civil Appeals of Oklahoma, Division No. 2.

April 29, 2003.

---

1. Claimant testified the meeting was at 8:30 a.m. Three witnesses stated the meeting was at lunchtime.

Jeffery J. Sheridan, Assistant District Attorney, Muskogee, OK, for Plaintiff/Appellee.

J. Eric Jones, Muskogee, OK, for Defendant/Appellant.

Opinion by JOE C. TAYLOR, Presiding Judge:

¶1 Natural mother, Debra Newton (Mother), seeks review of a judgment on a jury verdict terminating her parental rights to two minor children, T.L. and L.N. (Children). A third child, A.N., was originally a subject of this proceeding, but while the action was pending, reached the age of majority and has been dismissed from the case. The two issues raised by Mother on appeal are (1) whether the State of Oklahoma (State) presented evidence sufficient to sustain its burden of proving beyond a reasonable doubt that Mother's parental rights should be terminated; and (2) whether the trial court erred in admitting evidence concerning the conditions that existed when Children were adjudicated deprived. Based on our review of the record, the parties' briefs, and the applicable law, we answer the first question in the affirmative and the second in the negative. We find, however, the termination order is defective in that it does not contain certain mandatory findings required by Rule 8.2, Rules for District Courts of Oklahoma, 12 O.S.2001, ch. 2, app. We therefore affirm the judgment of termination but remand with instructions to enter a corrected final order that complies with Rule 8.2.

¶2 In July 1998, A.N., then age 16, T.L., age four, and L.N., age two, were taken into emergency protective custody based on allegations of sexual abuse of A.N., a genital injury to T.L., and general neglect and endangerment.[1] State petitioned for adjudica-

---

1. An affidavit from a Department of Human Services child welfare worker in support of the emergency order recites that A.N., who was then age 16, had reported being touched inappropriately by her stepfather, and that she had been raped by a man who had been living in her home

tion of all three children as deprived on grounds that they did not receive proper parental care and guardianship, that their home was "filthy and unsafe for young children," and that the two youngest children appeared malnourished. The petition also alleged the rape of A.N., and the injury to T.L., and Mother's failure to protect the children. Mother stipulated to the allegations of the petition, and, in August 1998, the court entered an order adjudicating the children deprived. The Cherokee Nation later was permitted to intervene, and it is undisputed that Children are Indian children as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(4).

¶ 3 The Department of Human Services' (DHS) initial report to the court (and other reports thereafter) indicated Mother had "a history of living with abusive men" and that DHS had previously received referrals— some of which were confirmed, while others were ruled out—on the family. The initial report also stated Mother neglected the children, failed to protect them, and failed to provide proper medical care. It stated Mother was living with a female friend at the time of the report, and had not visited A.N. at all, but had regularly visited the two younger children, both of whom were (and are) in foster care.[2]

¶ 4 The court approved a treatment plan requiring Mother to provide a home free of physical, emotional, and sexual abuse; attend parenting skills classes and obtain certain psychological assessments and counseling; recognize and take care of the children's medical needs in a timely manner, including all immunizations; support the children financially; maintain a clean and safe home for at least six months; and provide adequate amounts of appropriate food for the children. Regular, periodic review hearings reiterated these requirements. It is undisputed that Mother was aware of these requirements and understood them.

¶ 5 In February 2000, at State's recommendation, the court found that efforts to reunite the family had failed. State filed a petition to terminate Mother's parental rights in January 2001, alleging Mother failed to correct the conditions leading to the adjudication of Children as deprived; she abandoned Children; she willfully failed to contribute to Children's support; Children had been in foster care for 15 of the most recent 22 months; and termination was in Children's best interests.

¶ 6 The matter was tried over a two-day period in July 2001. State called six witnesses, including a State DHS investigator whose investigation led to the children being removed from Mother's home in 1998; the children's primary DHS caseworker and permanency planning worker from Muskogee County; a DHS case and permanency planning worker from Sequoyah County, where Mother moved after leaving Muskogee County; a caseworker from the Cherokee Nation Indian Child Welfare Agency; and Children's current foster mother.

¶ 7 The testimony in general showed that Mother was very slow to initiate work on the requirements of her treatment plan after it was entered, and that she brought progress on the plan to a complete halt in November 1999 when she abruptly decided to move from Muskogee to Sequoyah County. Mother told caseworkers she made the move in order to get married and take care of her ill mother, but even assuming the truth of that rationale the move resulted in a dramatic decrease in her visitation with Children, as well as the loss of her job and discontinuation of the minimal individual counseling services in which she had participated up to that time.

after the stepfather gave the man "permission" to have intercourse with A.N. In addition, T.L., who was four years old at the time, was reported to have an injury to his penis, which the stepfather admitted inflicting. The affidavit also recited dangerous conditions present at the home, and stated there were numerous people living in the home, including four adults, two teenagers, and two small children, but only three beds. Since the date these proceedings were filed, A.N. has reached the age of majority, and State did not seek to terminate Mother's parental rights as to her.

2. Later reports indicated Mother had settled her differences with A.N., however, and resumed visitation. A.N. reached age 18 in March 2000 and was dismissed from the case. By the time of trial in July 2001, she apparently was again living in the same house with Mother.

Further, within a few months of making the move, Mother and her new husband had separated, and Mother began living with another man in another town. Mother had had another child in May 1999, and the new child was with her as well.

¶ 8 By the time of trial, according to the testimony, Mother was living in a "one and one-half to two-bedroom" house littered with debris (inside and out) and shared by Mother, Mother's new boyfriend, Mother's own mother, Mother's brother, Mother's new baby, and A.N. (who, as previously noted, had reached age 18 and been dismissed from these proceedings). According to the DHS workers, not only were Mother's living accommodations inadequate and unsafe for the return of Children to Mother's care, but Mother had failed to complete almost all of the other requirements of her treatment plan. She had lived independently and supported herself for fewer than six weeks out of the previous three years. Moreover, according to a DHS court report and testimony by one of the workers, the one time Mother had been reunited with Children for more than just a few hours of visitation—during a two-week period when Mother was living at a county shelter after the new baby was born, and Children were also at the shelter because they were between foster homes— Mother complained about what a "handful" Children were and wondered how much longer it would be before they would be placed in another foster home.

¶ 9 The DHS caseworkers testified Mother was still living in substantially the same manner and engaging in substantially the same behavior that led to the adjudication of Children as deprived in 1998. They stated that returning Children to Mother's care was not in Children's best interests and recommended termination. A social worker from the Cherokee Nation who was involved in the case from its inception also testified that she had advised Mother on numerous occasions of the free or subsidized services available to Mother and encouraged Mother to pursue them, but that Mother had not followed the worker's advice or attempted to take advantage of any of the services until after State moved to terminate her parental rights. The Cherokee Nation worker also recommended that Mother's rights be terminated.

¶ 10 State rested after presenting its final witness, Children's foster mother, who testified that Children were doing well in her family's care, and that the foster family was willing to retain custody of Children. Mother demurred to State's evidence and moved to dismiss, which the trial court denied. Mother then rested without putting on any evidence. The jury returned a verdict making specific findings that Mother had failed to correct the conditions leading to the deprived adjudication; Mother had been given at least three months to correct the conditions but failed to do so; and termination of Mother's parental rights was in Children's best interests. The jury further determined that Children had been in foster care for 15 of the most recent 22 months, and that termination was in their best interests. The trial court entered judgment on the jury's verdict, and Mother appeals.

¶ 11 Because this is a case involving Indian children, the proceedings must comply with the provisions of both the federal ICWA, 25 U.S.C. §§ 1901 through 1963, and its Oklahoma counterpart, the Oklahoma ICWA, 10 O.S.2001 §§ 40 through 40.9. *See In re J.W.,* 1987 OK CIV APP 60, 742 P.2d 1171. Mother does not contend State failed to comply with these Acts. Rather, she alleges as error the trial court's failure to sustain Mother's demurrer to State's evidence as to the sufficiency of the evidence and as to the length of time Children had been in foster care before termination proceedings were filed. Mother also asserts the trial court erred by admitting evidence concerning the conditions existing when Children were taken into protective custody.

■ ¶ 12 The statutory grounds for termination of parental rights are found at 10 O.S.2001 § 7006–1.1. Ordinarily, the State's burden is to prove one or more of these grounds by "clear and convincing" evidence. However, in ICWA cases, State must prove "beyond a reasonable doubt" that continued custody by the parent is likely to result in serious emotional or physical damage to the child. 25 U.S.C. § 1912(f); *In re J.W.,* 1987 OK CIV APP 60, ¶ 15, 742 P.2d 1171, 1175;

*In re M.D.R.*, 2002 OK CIV APP 75, ¶ 6, 50 P.3d 1160, 1161. Appellate review of the evidence is thus directed toward assuring the evidence adduced by State, if believed, would support a conclusion by any rational trier of the facts that the State's evidence demonstrated beyond a reasonable doubt that continued custody by Mother would result in serious damage to Children. State has met its burden here.

¶ 13 As discussed above, State presented evidence by six witnesses, whose testimony was unrefuted and demonstrated a long-term familiarity with Mother's and Children's situations. The testimony clearly supported State's characterization of Mother as unable or unwilling to care for Children and of having a history of being involved with abusive partners to whom Mother turned over responsibility for Children's discipline. Mother's living situation when Children were adjudicated deprived was abhorrent. Her current situation is not much better and is certainly inadequate to accommodate two additional children of elementary school age. There is ample evidence indicating that Mother made little or no effort to improve herself or her situation during most of the time period that Children have been in foster care, and no evidence indicating Mother has any desire of her own to make such efforts now; in fact, one DHS worker testified that she had communicated more with Mother's current boyfriend about the case than she had with Mother.

¶ 14 We also note that Children had been in foster care for more than 28 consecutive months at the time State filed its termination petition—a period considerably longer than the statutory limit of "fifteen (15) of the most recent twenty-two (22) months preceding the filing of the petition" for termination under 10 O.S.2001 § 7006–1.1(15). There is no evidence that the chief reason for foster care placement of this length of time was "the delay attendant to [Mother's] exercise of [her] constitutional right to a jury trial," *In re M.C.*, 1999 OK CIV APP 128, ¶ 7, 993 P.2d 137, 139, and we, therefore, find no basis for Mother's argument that State's evidence on this issue was somehow deficient.

¶ 15 Accordingly, we find that State's evidence was sufficient to convince a rational juror beyond a reasonable doubt that Mother failed to correct the conditions leading to the deprived adjudication, that Children had been in foster care for 15 of the 22 months immediately preceding the filing of the termination proceedings, and that Children's emotional or physical safety and security would be jeopardized if Children were returned to Mother's custody. We therefore reject Mother's proposition of error on the ground of insufficient evidence.

¶ 16 Mother next alleges the trial court committed reversible error by admitting evidence related to the conditions existing when Children were adjudicated deprived. The crux of Mother's argument on this point is that, because Mother stipulated to the allegations of State's petition to adjudicate Children deprived, testimony and other evidence admitted at trial which went to the conditions in which Children were living when they were taken into protective custody was rendered either irrelevant or cumulative and unduly prejudicial under 12 O.S.2001 §§ 2402 or 2403.

¶ 17 We review a trial court's evidentiary determinations for abuse of discretion only. "The relevance and admissibility of evidence are matters entrusted to the sound legal discretion of the trial court." *In re J.M.*, 1998 OK CIV APP 141, ¶ 6, 964 P.2d 972, 973–74.

¶ 18 The evidence to which Mother objected at trial on this issue was testimony by a DHS investigator and a deputy sheriff who were called to the house where Mother lived when Children were taken into protective custody. The witnesses described the information received by DHS which led them to the home (including information that A.N. had been raped), the house's squalid and unhealthy condition, Children's malnourished state, and Children's and Mother's reactions to Children being taken away.

¶ 19 Although it is true, as Mother argues, that this evidence was highly prejudicial, Mother's argument ignores the fact that the evidence is directly relevant to two of the major elements that State must prove in order to terminate Mother's parental rights:

that Children were adjudicated deprived because of certain conditions which were caused or contributed to by acts or omissions of Mother, and that Mother failed to correct those conditions despite being given time to do so. 10 O.S.2001 § 7006–1.1(A)(5); *see also In re J.M.,* 1998 OK CIV APP 141, 964 P.2d 972; *In re M.K.,* 1998 OK CIV APP 118, 964 P.2d 241.

¶ 20 We find inapplicable *Jones v. State,* 1987 OK CR 103, 738 P.2d 525, the authority on which Mother relies to argue that the evidence, even if relevant, was unduly prejudicial and thus excludable under 12 O.S.2001 § 2403. *Jones* is a criminal case in which the Court of Criminal Appeals held the danger of unfair prejudice outweighed the probative value of allowing the jury to view more than one graphic color photograph of a murder victim whose body had been recovered from a river. The Court held that such evidence was cumulative and unnecessary to establish certain elements of the State's case. *Id.* at ¶¶ 6–9, 738 P.2d at 527.

¶ 21 In the case at bar, however, the testimony by the DHS investigator and deputy sheriff were needed to establish and explain to the jury an essential element of State's case by explaining the allegations of the adjudication petition. Without illustrating the conditions that existed when Children were taken into custody, State could not prove that Mother had failed to correct those conditions. The witnesses did not go into extreme, undue, or graphic detail, and Mother was afforded a full and fair opportunity to cross examine each witness at length. No graphic photos or inflammatory language was used, nor were photos or other visual exhibits introduced. We view the situation as distinguishable from *Jones,* and that case provides no authority for us to find an abuse of discretion in the trial court's decision to allow the evidence about which Mother complains. We therefore reject Mother's argument on this proposition of error.

¶ 22 Though not raised by Mother on appeal, a final issue which must be addressed concerns the final order entered by the trial court on the jury's verdict. The order is flawed in that it does not contain the recitations required by District Court Rule 8.2, 12

O.S.2001, ch. 2, app.: the order lacks a recitation finding compliance with the ICWA, a finding of compliance with Oklahoma's Uniform Child Custody Jurisdiction Act (UCCJA), and specific findings as to Children's full legal names and birth dates. Inclusion of such findings is mandatory, not optional, under rule 8.2. *See also In re M.D.R.,* 2002 OK CIV APP 75, ¶ 9, 50 P.3d 1160, 1162. The record presented reflects compliance with the ICWA as well as the UCCJA, and as noted above Mother does not challenge the validity of the judgment on either of these grounds; thus, we do not vacate or reverse the trial court's judgment due to these defects, but instead remand the case with instructions to the trial court to take such actions as are necessary to correct the delineated deficiencies in the final order. The court's judgment is otherwise affirmed in all respects.

¶ 23 AFFIRMED AND REMANDED WITH INSTRUCTIONS.

COLBERT, V.C.J., and STUBBLEFIELD, J., concur.